TTAB



**THE UNITED STATES PATENT AND TRADEMARK OFFICE**
**BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD**

| | |
|---|---|
| CAREFIRST OF MARYLAND, INC.,<br>d/b/a CAREFIRST BLUECROSS<br>BLUESHIELD,<br><br>OPPOSER,<br><br>v.<br><br>FIRSTHEALTH OF<br>    THE CAROLINAS, INC.,<br><br>APPLICANT. | ) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) |

12-02-2002

U.S. Patent & TMOfc/TM Mail Rcpt Dt. #77

OPPOSITION NO. 116,355

(Ser. No. 75/455,343)

**OPPOSER'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE A
SUBSTITUTE MEMORANDUM IN OPPOSITION TO APPLICANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

Opposer, through its counsel, expressly regrets that the Board's precious time has been re-directed from the merits, to argument about whether Opposer's footnotes have been used as a manner of "subterfuge" to avoid the page limitations set forth in Rule 2.127(a). Opposer is very mindful of the sanctions applied in *Carrini, Inc. v. Carla Carini S.R.L.*, 57 USPQ2d 1067 (TTAB 2000), and Opposer, through its counsel, wishes to apologize to the Board for this "round" of briefing.[1] Since the Board's previous orders, Opposer's counsel has done his best to move this case along, but it appears that despite those efforts, new issues are generated.

Simply put, Opposer does not believe that its footnotes are in violation of Rule 2.127(a) and wishes to assure the Board that it has never intended to use its footnotes as subterfuge to violate that

---

[1] This round of briefing was started by Opposer when it filed its Motion for Leave to Correct Certain Errors on September 16, 2002, and voluntarily requested that its table of contents and table of exhibits be stricken; not until after that Motion did Applicant begin to take issue with Opposer's Memorandum in Opposition to Applicant's Motion for Partial Summary Judgment.

Rule. With the exception of footnote 36, Opposer believes that all the remaining footnotes properly cite to the record, points of clarification in the record, to judicial authority, and where applicable, to the relevant points in that authority. Opposer believes that its use of footnotes is proper. As with the use of bullets, the use of footnotes is highly recommended by legal writing authorities.[2] The use of footnotes become perhaps subterfuge when a brief is filled with "numerous footnotes" with "substantive discussion" as demonstrated by the examples in Exhibit A attached hereto.

Opposer, in its Motion for Leave to File a Substitute Memorandum in Opposition to Motion for Partial Summary Judgment, conceded that its footnote 36 contains a substantive argument and discussion. Initially, Opposer had considered filing a separate motion on the issue discussed at footnote 36. No doubt, had it done so, Applicant would now be arguing that Opposer violated Rule 2.127(a) by filing two briefs, instead of one, in violation of the Board's decision in *The Administration of the Estate of Tupac Shakur v. Thug Life Clothing, Co.*, 57 USPQ2d 1095 (TTAB 1990).

## CONCLUSION

In sum, it appears that the Board is giving Rule 2.127(a) as amended, a very narrow interpretation. Insofar as Rule 2.127(a) is inclusive of tables of contents, tables of exhibits, etc., Opposer voluntarily offered to strike those documents from its brief and readily admits that it, like others before it, apparently ran afoul of the Board's recent interpretation of that Rule.

Insofar as Applicant has alleged that Opposer's use of "bullets" was an attempt to circumvent Rule 2.127(a), Opposer has assured the Board there was no intention to do so. Opposer's use of bullets is in accordance with legal recommendations by legal writing authorities

---

[2] See Bryan A. Garner, The Winning Brief: 100 Tips for Persuasive Briefing in Trial and Appellate Courts, pages 114-130. (1996). Copies of the referenced pages are attached as Exhibit A.

and is essentially no different from use of single space quotes from judicial authority. To eliminate any question of wrongdoing, Opposer voluntarily deleted their existence from the substitute brief.

Insofar as Applicant continues to allege that Opposer's use of footnotes is an attempt to circumvent Rule 2.127(a), Opposer again, through counsel, wishes to assure the Board there was never any such intention and that Opposer honestly believes that it is not in violation of the Rule. Its brief does not contain numerous footnotes with "substantial discussion" comparable to what apparently occurred in *Consorzio del Prosciutto di Parma v. Parma Sausage Products, Inc.,* 23 USPQ2d 1894, 1896, n. 3 (TTAB 1992) or to that which is demonstrated in Exhibit A.

In view thereof, Opposer respectfully requests the Board to find (1) that its initial brief as filed on August 5, 2002 was in compliance with Rule 2.127(a), and/or if not, (2) that Opposer's substitute brief as filed on October 28, 2002 is in compliance.

Respectfully submitted,

STEVENS, DAVIS, MILLER, & MOSHER, LLP

Barth X. deRosa
Ruth M. Finch
Karen A. Sekowski
Counsel for Opposer
1615 L Street, N.W., Suite 850
Washington, D.C. 20043
Tel:     (202) 785-0100
Fax:     (202) 408-5200

## CERTIFICATE OF SERVICE

I hereby certify that one copy of the foregoing Opposer's Reply In Support of *Motion for Leave to File a Substitute Memorandum in Opposition to Motion for Partial Summary Judgment* together with Exhibits A is being forwarded this ___ day of December, 2002, to counsel for Applicant, by first class mail, postage prepaid.

Anthony J. Biller, Esquire
Coats & Bennett PLLC
1400 Crescent Green, Suite 300
Cary, North Carolina 27511

_____
Barth X. deRosa

# The Winning Brief

## 100 TIPS FOR PERSUASIVE BRIEFING IN TRIAL AND APPELLATE COURTS

Bryan A. Garner



OXFORD
UNIVERSITY PRESS

# OXFORD
UNIVERSITY PRESS

198 Madison Avenue, New York, NY 10016

Oxford University Press is a department of the University of Oxford.
It furthers the university's objective of excellence in research, scholarship,
and education by publishing worldwide in

Oxford  New York

Athens  Auckland  Bangkok  Bogotá  Buenos Aires  Calcutta
Cape Town  Chennai  Dar es Salaam  Delhi  Florence  Hong Kong  Istanbul
Karachi  Kuala Lumpur  Madrid  Melbourne  Mexico City  Mumbai
Nairobi  Paris  São Paulo  Singapore  Taipei  Tokyo  Toronto  Warsaw

with associated companies in Berlin  Ibadan

Oxford is a registered trademark of Oxford University Press
in the United Kingdom and in certain other countries

Copyright © 1996, 1999 by Bryan A. Garner

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
electronic, mechanical, photocopying, recording, or otherwise,
without the prior permission of Oxford University Press.

Library of Congress Cataloging-in-Publication Data

Garner, Bryan A.
The winning brief : 100 tips for persuasive briefing
in trial and appellate courts / Bryan A. Garner.
p.    cm.
Includes bibliographical references and index.
1. Briefs—United States.   2. Legal composition.   I. Title.
[KF251.G37 1999]   808'.06634—dc21   98–56204 CIP
ISBN 0–19–512808–7

Printing (last digit): 9 8 7 6 5 4

Printed in the United States of America
on acid-free paper

# 22

# Put all your citations in footnotes, while saying in the text what authority you're relying on. But ban substantive footnotes.

## Quotable Quotes

### References in footnotes:

[W]here a brief is written with the hope of presenting an argument [that] will be interesting as well as instructive, footnotes may advantageously be used for the incorporation of necessary reference material, the inclusion of which in the text would interrupt the otherwise smooth-flowing chain of argument.

—Frank E. Cooper, *Writing in Law Practice* 266 (1953)

[T]he system used for citing references should be designed to give minimum interruption to readers' progress through the text. It should allow them to concentrate on primary information.

—Christopher Turk & John Kirkman, *Effective Writing: Improving Scientific, Technical, and Business Communication* 69–70 (2d ed. 1989)

Many brief writers suffer chronic cases of literary hiccups. They insert citations as often as possible, three or four in a simple declaratory sentence, irrespective of how these interfere with the flow of the prose, the rhythm of the presentations or the order of argument.

—Ruggero J. Aldisert, *Winning on Appeal: Better Briefs and Oral Argument* 202 (1992)

Only the hardiest of stylists will own up to this difficult fact: in many types of legal writing—in briefs and memos, for example—the only sensible place for citations is in footnotes. Putting them in the body clutters the text, slows the reader, and hampers the writer's ability to construct a coherent paragraph. Few writing reforms would benefit the legal world more than adopting the following rules: (1) put all citations in footnotes; and (2) ban footnotes for all purposes other than providing citations.

—Bryan A. Garner, *A Dictionary of Modern Legal Usage* 156 (2d ed. 1995)

Expl.

114

**No substantive footnotes:**

Every legal writer is presumed to be a liar until he proves himself otherwise with a flock of footnotes.

—Fred Rodell, *Goodbye to Law Reviews—Revisited,* 48 Va. L. Rev. 279, 282 (1962)

Perhaps no single implement of all the vast apparatus of scholarship is so thoroughly misused in the law as the footnote. There may be some justification in the manifold areas of the academic world for that formidable display of learning and industry, the thin stream of text meandering in a vale of footnotes, but such a technique is quite self-defeating in the law: it makes the writer's thoughts more difficult to follow—and hence far less likely to persuade the judicial reader.

—Frederick B. Wiener, *Briefing and Arguing Federal Appeals* 245 (1967)

If your point is important, it belongs in the text; if it is not important, it does not belong in the brief. Like all rules, this one may have exceptions, and occasionally a particular case may necessitate the use of footnotes; but, as a rule of thumb, work with the presumption that they will not be utilized. You are not writing a scholarly law review article that is expected to be filled with long, tortuous footnotes.

—Harvey C. Couch, *Writing the Appellate Brief,* 17 Prac. Law. 27, 30 (1971)

If footnotes were a rational form of communication, Darwinian selection would have resulted in the eyes being set vertically rather than on an inefficient horizontal plane.

—Abner J. Mikva, *Goodbye to Footnotes,* 56 U. Colo. L. Rev. 647, 648 (1985)

Footnotes . . . are usually a sign that the writer has not thought out carefully what he or she wanted to say, or what importance to attach to each piece of information.

—Christopher Turk & John Kirkman, *Effective Writing: Improving Scientific, Technical, and Business Communication* 71 (2d ed. 1989)

It is a measure of the legal distemper that we see news articles, from time to time, about the new record for the number of footnotes in a law-review piece. At last count, the record had approached 5,000 footnotes in a single article. We have enough difficulty wading through an article 5,000 words long; quadruple the length of the article, add in several thousand footnotes, and you overwhelm even the most intrepid reader.

—Bryan A. Garner, *The Elements of Legal Style* 91 (1991)

## Explanation

### Put Citations in Footnotes

The age-old convention for briefs is that citations belong in the text. That's never been so of law reviews and treatises, but there must be a good reason why briefs are different. Right?

Wrong. The reason is quite simple: the traditional method of preparing briefs involved typewriters, and it was all but impossible to get citations in footnotes with manual typewriters. That's why citations were in the text in 1900, and that's why they were still there in 1975. And during that period, the convention hardened.

Meanwhile, of course, the number of cases being cited in a typical brief exploded between 1900 and 1975. And today, things have gotten even worse. With computer research and the proliferation of caselaw, it has become easier than ever to find a passel of cases to support almost every sentence in a brief.

So, over time, the pages of briefs have become increasingly cluttered. Some have become virtually unreadable. Others are readable, but only by a reader who is mentally and emotionally capable of dealing with lots of underbrush.

Citations have posed a major problem not just for readers, but also for writers. Many lawyers have gotten in the habit of putting a citation or two between sentences, thereby weakening the connections between consecutive sentences, and then distrusting the reader to make a connection. Thus, they repeat the relevant part of the preceding sentence in the one that follows, so that the sentences get longer and longer and more and more repetitive. All this is anathema to a good writing style.

So, you see, even if readers think they can handle citations in the text, the fact is that most legal writers can't.

Although writers continue to experiment with possible solutions—such as putting citations in smaller type in the text or in colored ink, both of which violate the Federal Rules of Appellate Procedure—the sensible solution is to use reference notes. That is, put citations (and only citations) in footnotes. And write in such a way that no reader would ever have to look at your footnotes: give the name of the court you're quoting, the year in which it wrote, and (if necessary) the name of the case up in the text. Just get the numbers out of the way.

"Why not endnotes?" you might ask. Well, endnotes simply aren't handy. For the reader who really wants to see the citation, it's annoying to have to flip back and find the relevant note. You've probably tried to read books that annoyed you in this very way.

Finally, if you think this is such an off-the-wall idea, ask yourself why you've never seen a biography written like this:

> Holmes was ready for the final charge. His intellectual powers intact (Interview by Felix Frankfurter with Harold Laski, 23 March 1938, at 45), he organized his work efficiently so that little time was wasted (3 Holmes Diary at 275; Holmes letter to Isabel Curtain, 24 June 1923). He volunteered less often to relieve others of their caseload (Holmes court memo, 24 July 1923, at 4), and he sometimes had to be reassured of his usefulness (Brandeis letter to Felix Frankfurter, 3 March 1923). His doctor gave him a clean bill of health (Mass. Archives doc. no. 23-47899-32, at 1), told him his heart was "a good pump" (Holmes letter to Letitia Fontaine, 25 June 1923), and that very few men of Holmes's age were "as well off as he was" (*id.*)—to which Holmes drily replied that "most of them are dead" (Memo of Dr. Theobald Marmor, 26 June 1923). But he was pleased that the "main machinery" was "in good running order" (Holmes letter to Letitia

Fontaine, 25 June 1923), and he frequently felt perky enough to get out of the carriage part way home from court and walk the remaining blocks with Brandeis (Brandeis letter to Clare Eustacia Bodnar, 22 July 1923).

A historian would be insane to ruin a good story that way. But brief-writers commonly do something like it.

Besides improving readability, putting citations in footnotes allows you to strip down an argument and focus on what you're really saying. In Example A, for instance, you'll see a lack of coherence once the citations have been removed. This type of incoherence is commonplace, but textual citations help mask it.

Three final points.

First, you generally shouldn't just footnote naked propositions of law. Instead, say something like "New Jersey courts have held . . ." or "Section 28.007 of the Probate Code requires . . ." so that the reader can get the gist of your authority without having to glance down at the bottom of the page.

Second, even when citing cases in footnotes, some writers think they should put record references in the text if they're uniformly short. That's the method in the three model fact statements in tip #80. My own preference is to put even the record references in footnotes (see pp. 421–426). The prose gains continuity if it's not interrupted by little parentheticals.

Third, know your audience. Some judges say they don't like citations in footnotes. I happen to believe that they haven't fully thought through the point or seen good examples. Why do I think that? Because every time I teach a seminar on judicial writing, a vast majority of the judges finally conclude that they think it makes sense to put citations in footnotes. A few others, however, think otherwise. And if you know that's what a judge thinks, take heed of the judge's preference. Just don't let your temporary heed become your regular habit.

## Ban Substantive Footnotes

In substantive footnotes—as distinguished from footnotes limited to citations—a writer argues or explains points related to those in the text. Although some judges defend substantive footnotes,* the safer bet is that your judicial reader will react to them with revulsion. It's a common feeling among judges these days because so many brief-writers abuse footnotes. Sometimes the writer wants to seem more scholarly; sometimes the purpose is to squeeze more words into the brief.

There's surely much to be said for substantive footnotes in scholarship. But in purely persuasive writing, you'll find them pretty easy to do without. My rule of thumb allows one or two substantive footnotes in a year of busy brief-writing.

Adopt an up-or-out policy: if it's not important enough to say up in the text, then take it out of the brief altogether.

---

* *See* Edward J. Becker, *In Praise of Footnotes,* 74 Wash. U. Law Q. 1 (1996).

# Some Before-and-After Examples

### Example A

*Before*  Under California law, an action for relief on the ground of fraud must be commenced within three years after the aggrieved party discovered the alleged wrongdoing. *April Enters., Inc. v. KTTV,* 147 Cal. App. 3d 805, 826 (1983); *Winn v. McCulloch Corp.,* 69 Cal. App. 3d 663, 672 (1976). Because California courts have determined that negligent misrepresentation is a form of fraud, *Gold v. Los Angeles Democratic League,* 49 Cal. App. 3d 365, 373 (1975), they have held that the applicable statute of limitations is the same as for causes of action based on fraud, *Luksch v. Latham,* 675 F. Supp. 1198, 1204 n.10 (N.D. Cal. 1987); *see also Bowden v. Robinson,* 67 Cal. App. 3d 705, 715–17 (1977).

Under California law a claim based on negligence must be filed within two years of the date of injury. Cal. Code Civ. P. § 339(1); *Burt v. Irvine Co.,* 237 Cal. App. 2d 828 (1965) (holding that an action against a corporate director for loss to corporation through director's negligence is governed by two-year statute). A cause of action in tort accrues when the allegedly wrongful act was committed. *Cline v. Yamaga,* 97 Cal. App. 3d 239, 245 (1979); *Sonbergh v. MacQuarrie,* 112 Cal. App. 771, 773 (1952).

Under California law, intentional infliction of emotional distress, as an injury to the person, is governed by the one-year statute of limitations contained in California Code of Civil Procedure Section 340(3). *Cantu v. Resolution Trust Corp.,* 4 Cal. App. 4th 857, 889 (1992). Under Section 340(3), claimants must commence their action within one year after the cause of action accrued. Cal. Code Civ. P. § 340(3). This statutory period begins to run once the claimant suffers severe emotional distress as a result of outrageous conduct. *Id.* (holding that, where filing of complaint was the outrageous conduct, cause of action accrued at the moment complaint was filed).

*The "Before" Version Stripped Down*  Under California law, an action for relief on the ground of fraud must be commenced within three years after the aggrieved party discovered the alleged wrongdoing. Because California courts have determined that negligent misrepresentation is a form of fraud, they have held that the applicable statute of limitations is the same as for causes of action based on fraud.

Under California law a claim based on negligence must be filed within two years of the date of injury. A cause of action in tort accrues when the allegedly wrongful act was committed.

Under California law, intentional infliction of emotional distress, as an injury to the person, is governed by the one-year statute of limitations contained in California Code of Civil Procedure Section 340(3). Under Section 340(3), claimants must commence their action within one year after the cause of action accrued. This statutory period begins to run once the claimant suffers severe emotional distress as a result of outrageous conduct.

*After*  Under California law, the three-year statute of limitations for fraud begins when the aggrieved party discovers the alleged wrongdoing.[1] Because California courts have determined that negligent misrepresentation is a form of fraud,[2] they have uniformly held that the three-year statute applies.[3]

But a claim based on negligence must be filed within two years of the injury—measured from the time of the allegedly wrongful act.[4]

Meanwhile, intentional infliction of emotional distress, as an injury to the person, is governed by the one-year limitations period of § 340(3).[5] This period begins to run once the claimant suffers severe emotional distress as a result of outrageous conduct.[6]

### Example B

*Before*    Nor is the due-process requirement satisfied. "Due process requires that a defendant have sufficient contact with the forum state so that an exercise of long-arm jurisdiction will not offend 'traditional conceptions of fair play and substantial justice,' . . . 'and so that a defendant should reasonably anticipate being haled into court there.'" *Tidgewell*, 820 F. Supp. at 632 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945) and *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). "The Court has identified five relevant criteria: (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." *United Elec. Radio & Mach. Workers*, 960 F.2d at 1088 (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

*After*    Nor is the due-process requirement satisfied: "[A] defendant must have sufficient contact with the forum state so that an exercise of long-arm jurisdiction will not offend 'traditional conceptions of fair play and substantial justice,' . . . 'and so that a defendant should reasonably anticipate being haled into court there.'"[32] In gauging this standard, the Supreme Court has named five relevant criteria:

- the defendant's burden of appearing;

- the forum state's interest in adjudicating the dispute;

- the plaintiff's interest in obtaining convenient and effective relief;

- the judicial system's interest in obtaining the most effective resolution of the controversy; and

- the common interests of all sovereigns in promoting substantive social policies.[33]

# An Example of What Leads Judges to Detest Substantive Footnotes

APPLICANT INTERVENOR may be impaired in civil prosecution sui juris of federal law allegation of "prohibited activities" under a pattern of racketeering, inclusive of the intervening state court judgment[10] as a component artifice, capable of proof by a preponderance of the evidence[11] as contradistinguished from the accelerated "clear and convincing" standard required to establish both vacation of the state court proceeding[12] and proof of any underlying state law questions which substantively devolve to common law fraud.

---

[10] Judicial review of the pending vacation petition weights heavily the correct analysis of the issues interposed and dispositioned in Civil Action No. CJ-49-87-96 (Okl.Co.Okl.1986) and interpretation of the character and effect to be accorded such. By its own terms, 12 Okla.Stat.§1031 applies only to "judgments" or "orders." The Oklahoma statute is therefore distinguishable from its federal counterpart, Rule 60(b), Fed.R.Civ.Proc. which applies only to "final" judgments or orders. The question of "finality" is critical to the underpinnings of procedural and substantive analysis in review of the petition. In ruling on the § 1031 petition is it error for the Court to inferentially hold the apparent stipulated judgment to be a final one? It does not appear from the record that the stipulated compromise and settlement of claims and "judgment" were contingent upon further judicial proceedings. If that were true, the "judgment" would not be final. The stated test for "finality" is whether the "judgment" is appealable. The entry into the compromise and settlement agreement appears to have rendered the disposition of the matter a consent judgment. While a consent judgment may become a final judgment of a court, it is not "appealable" in the usual sense. Consent judgments are therefore indistinguishable from litigated judgments for purposes of § 1031 analysis. *Zimmerman v. Quinn,* 744 F.2d 81, 82 (10th Cir. 1984). Once concluded, a settlement is as binding, conclusive and final as if it had been incorporated into a judgment. So read, the stipulation and judgment are final.

[11] "The Supreme Court strongly suggests that the proper burden of proof of predicate acts in RICO litigation is by a preponderance of the evidence. *Sedima,* 105 S.Ct. at 3282-83 (no indication that Congress sought to depart from preponderance standard); *Armco Industrial Credit Corp. v. SLT Warehouse Co.,* 782 F.2d 475, 481 (5th Cir. 1986) (noting that Supreme Court "strongly suggested" that preponderance standard applies). Post-*Sedima* appellate decisions hold that a plaintiff in a civil RICO action bears a "preponderance of the evidence standard" of proof. *E.g., Cullen v. Margiotta,* 811 F.2d 698, 731 (2d Cir. 1987); *United States v. Local 560, International Brotherhood of the Teamsters,* 780 F.2d 267, 279-80 n.12 (3rd Cir. 1985), *cert. denied,* _____ U.S. _____, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986). We have found no civil RICO cases applying the clear and convincing standard of proof for predicate acts. Conversely, district courts have uniformly applied the preponderance standard. [citations omitted]. ("Third Circuit and the Supreme Court have concluded that the proper standard of proving predicate acts is by a preponderance of the evidence"). We conclude that the preponderance of evidence standard applies to proof of predicate acts in civil RICO litigation." *Wilcox v. First Interstate Bank of Oregon, N.A.,* 815 F.2d 522, 531 (9th Cir. 1987).

[12] At the postjudgment vacation stage, the burden is upon the movant to overcome the presumption of correctness that attaches to the trial court's decision and to the proceedings by "clear, cogent, and

The critical component of the impairment theory devolves to a judgment analysis of whether § 1031 (¶ IV) review sub judice actually metastasizes federal law issue preclusion under the Full Faith and Credit Act, 28 U.S.C. § 1738 (1982). The metastasis would occur not only as to pure state law issues of common law fraud justiciable under pendent jurisdiction, but also as to heretofore pristine federal law issues. Academic scrutiny finds impairment to be more than conjecture.

---

convincing" evidence. Therefore, the presumption of prima facie fraud inuring to the "confidential relation" between fiduciary and cestui que trust [fn.13, infra.] at the prejudgment stage does not continue under the § 1031 burden of proof. "The principle governing a movant's burden of proof for post-judgment vacation relief is vastly different from that which applies to the allocation of onus probandi and of the pleading burden in prejudgment stages." *Davidson v. Gregory et al.,* No. 65,146 (Okl.S.Ct. May 31, 1989) Vol. 60 OKLA.B.J. 1464, 1467 at Note 19. Every fact not negatived by the record must be presumed to support the trial court's judgment or order. Intervention by the trial court under authority of 60 Okla.Stat. § 175.23(A) in Civil No. CJ-86-5861 is by equitable cognizance. Consent judgments are indistinguishable from litigated judgments for purposes of §1031 analysis. "While an appellate court may and will examine and weigh the evidence, the findings and decree of the trial court cannot be disturbed unless found to be clearly against the weight of the evidence. Whenever possible, an appellate court must render, or cause to be rendered, that judgment which in its opinion the trial court should have rendered. If the result is correct the judgment is not vulnerable to reversal because the wrong reason was ascribed as a basis for the decision or because the trial court considered an immaterial issue or made an erroneous finding of fact. We are bound neither by the reasoning nor by the findings of the trial court. Whenever the law and facts so warrant, an equity decree may be affirmed if it is sustainable on any rational theory and the ultimate conclusion reached below is legally correct. Once invoked in a proper proceeding, equity will administer complete relief on all issues formed by the evidence regardless of whether the pleadings specifically tendered them for resolution." *Matter of Estate of Bartlett,* 680 P.2d 369, 374 (Okl. 1984). Resolution of the vacation petition under § 1031 analysis rests upon criteria of (1) against the clear weight of evidence, and (2) clear abuse of discretion. *Brown v. Batt,* 631 P.2d 1346, 1348 (Okl. App. 1981). A strong showing is required with respect to a stipulated judgment by consent.

# A Model Example of Citations in Footnotes

> *Beverly Ray Burlingame of Dallas is a master at writing readable briefs with citations in footnotes. What follows is a brief for an evidentiary hearing in federal court. Notice how clean the pages look in comparison with those in most briefs.*

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS DALLAS DIVISION

| | | |
|---|---|---|
| JOHNSON ELECTRONICS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION No. 97 CV 126 |
| | § | |
| SEMPRO CORPORATION, | § | |
| | § | |
| Defendant. | § | |

### Johnson's Brief on the Use of Extrinsic Evidence in Claims Construction

This brief addresses SemPro's objections to the exhibits that Johnson intends to offer at the upcoming *Markman* hearing.[1] These objections are apparently based on two errors by SemPro: (1) it has misinterpreted the purpose of some of the exhibits; and (2) it has overlooked recent Federal Circuit law, including the *Markman* case itself, explaining the proper role of extrinsic evidence in construing patent claims.

---

[1] *See* Letter from John Reynolds, dated April 24, 1998 ("Reynolds Letter"), attached to this brief as Exhibit A.

JOHNSON'S BRIEF ON THE USE OF EXTRINSIC EVIDENCE—Page 1

Argument

**A.  Extrinsic evidence can properly be used in claim construction as long as it does not vary the unambiguous meaning of the claim.**

As the Federal Circuit has observed, "In determining the proper construction of a claim, the court has numerous sources that it may properly utilize for guidance."[2] When the court is unfamiliar with technical terms or the underlying technology of a patent, "the testimony of witnesses may be received upon these subjects, and any other means of information [may] be employed."[3]

In construing a claim, a district court should look first to the intrinsic evidence of record, including the claim, the specification, and, if in evidence, the prosecution history.[4] If this public record "unambiguously describes the scope of the patented invention," then reliance on extrinsic evidence is improper.[5] But if the meaning of a disputed claim cannot be determined from the public record, then extrinsic evidence may be helpful, particularly if a critical technical aspect of the invention was neither discussed in the specification nor commented on during patent prosecution.[6]

Under such circumstances, extrinsic evidence—including expert testimony, inventor testimony, dictionaries, technical treatises, and articles—may be useful to the court

---

[2]  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

[3]  *Markman v. Westview Instruments, Inc.*, 116 S. Ct. 1384, 1394–95 (1996) (quoting 2 W. Robinson, *Law of Patents* § 732, at 481–83 (1890)).

[4]  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 984–85 (Fed. Cir. 1995) (in banc), *aff'd*, 116 S. Ct. 1384 (1996).

[5]  *Vitronics*, 90 F.3d at 1583.

[6]  *Fromson v. Anitec Printing Plates, Inc.*, 132 F.3d 1437, 1444 (Fed. Cir. 1997) (approving the use of "extrinsic evidence derived from expert testimony, demonstrative evidence, and scientific tests").

in reaching a proper understanding of the patent and of the claim language.[7] The only pertinent limit on using such evidence is that the court should not rely on it to vary or contradict unambiguous claim language.[8]

## B.    SemPro has no valid objection to the extrinsic evidence that may be offered by Johnson.

### 1.    Evidence concerning prior art—both cited and uncited—is relevant in construing the asserted claims.

As SemPro apparently recognizes, some of Johnson's exhibits relate to prior products and patents that were not cited in the prosecution histories of the patents-in-suit.[9] From this fact, SemPro leaps to the incorrect conclusion these exhibits will be offered at the *Markman* hearing to prove that some of the asserted claims are invalid.[10] Although for some claims, Johnson has asserted the defense of invalidity based on prior art, the issue of invalidity is not the subject of this proceeding. Indeed, Johnson intends to offer prior art at the *Markman* hearing to show that to the extent that any claim may be found ambiguous, it must be construed narrowly to *uphold* its validity.

Under well-established law, patent claims "are generally construed so as to sustain their validity, if possible."[11] As Johnson's previously filed brief makes clear, the

---

[7]    *See Vitronics,* 90 F.3d at 1584; *Markman,* 52 F.3d at 979–81.

[8]    *Vitronics,* 90 F.3d at 1584–85 (extrinsic evidence cannot be used "to vary or contradict the manifest meaning of the claims").

[9]    *See* Reynolds Letter at 1.

[10]    *See id.*

[11]    *Whittaker Corp. v. UNR Indus., Inc.,* 911 F.2d 709, 712 (Fed. Cir. 1990); *see Modine Mfg. Co. v. U.S. Int'l Trade Comm'n,* 75 F.3d 1545, 1557 (Fed. Cir. 1996) (when "reasonably possible," claims should "be interpreted so as to preserve their validity"); *ACS Hosp. Sys., Inc. v. Montefiore Hosp.,* 732 F.2d 1572, 1577 (Fed. Cir. 1984).

relevant prior art—both cited and uncited—is being offered by Johnson so that the claims can be properly, and narrowly, construed to avoid their being invalidated by the prior art.[12]

In *Amhil Enterprises,* the Federal Circuit construed a claim to sustain its validity over several instances of prior art.[13] There, the court addressed the proper meaning of "substantially vertical" in describing the faces and side edges of a cup lid. The court first considered the prior art Zabner and Davis patents, which were cited by the examiner in initially rejecting the claim under section 103.[14] As the court explained, the patentee distinguished its invention from the cited prior art "based in part on the slope of the projection faces."[15] Thus, the term "substantially vertical" was construed to mean "vertical," or "not including lids with sloping faces like those of Zabner '645."[16]

As the Federal Circuit explained, the claim had to be construed narrowly to avoid the prior art:

> Finally, it is apparent from our review of the prior art of record that lids of the general construction claimed in the '244 patent were common in the industry. Several prior art lids depict outwardly extending projections with variously sloped outward faces as may be seen in the figures from some prior art lid patents reproduced in the attached appendix. In order for claim 1 of the '244 patent to "avoid" these prior art lids, "substantially vertical face" must be construed as the same as or very close to "vertical face." . . . Any other construction of claim 1 would render it invalid.[17]

---

[12] *See* Johnson's Pre-*Markman*-Hearing Brief on Claim Construction at 5, 10, 42–45, 55–59.

[13] *Amhil Enterprises Ltd. v. Wawa, Inc.,* 81 F.3d 1554, 1559–62 (Fed. Cir. 1996).

[14] *Id.* at 1560–61.

[15] *Id.* at 1561.

[16] *Id.*

[17] *Id.* at 1562; *see id.* at 1565.

Exactly the same type of analysis will be required for some of the claims asserted in the present case. These claims must be construed so that they avoid the prior art. Otherwise, as in *Amhil Enterprises,* the claims would be rendered invalid.

SemPro suggests that while prior art that was actually cited in the prosecution history might be relevant, the Court should ignore any prior art that was not cited.[18] But in *Vitronics,* the Federal Circuit expressly authorized considering both cited and uncited prior art in construing patent claims: "a court in its discretion may admit and rely on prior art proffered by one of the parties, *whether or not cited in the specification or the file history.*"[19]

Consistent with *Vitronics,* a Michigan federal court recently used extrinsic prior art in construing a claim to sustain its validity.[20] As the district court explained, the "Chudov prior art reference serves as extrinsic evidence, i.e., evidence external to the patent and prosecution history, that demonstrates the state of the art at the time of the invention."[21] Quoting *Markman,* the court observed that this extrinsic prior art was "useful 'to show what was then old, to distinguish what was new, and to aid the court in the construction of the patent.'"[22]

The *Renishaw* court then construed the claim to sustain its validity over the uncited prior-art Chudov reference: "Using [plaintiff's] proposed construction, these limitations, along with the rest of claim 51, literally read on the Chudov reference. . . .

---

[18]  *See* Reynolds Letter at 1.

[19]  *Vitronics,* 90 F.3d at 1584 (emphasis added).

[20]  *See Renishaw v. Marposs Societa' Per Azioni,* 974 F. Supp. 1056, 1088–89 (E.D. Mich. 1997).

[21]  *Id.* (citing *Markman,* 52 F.3d at 980).

[22]  *Id.* at 1089 (quoting *Markman,* 52 F.3d at 980, and *Brown v. Piper,* 91 U.S. 37, 23 L. Ed. 200 (1875)).

JOHNSON'S BRIEF ON THE USE OF EXTRINSIC EVIDENCE—Page 5

To avoid rendering claim 51 invalid, these limitations would have to be construed so as to exclude the Chudov reference . . . ."[23] In the same way, some of the asserted claims in this case should be construed to avoid rendering them invalid based on extrinsic prior art that will be proffered by Johnson at the *Markman* hearing.

Despite SemPro's objections, both cited and uncited prior art may properly be considered and used by this Court in construing the asserted claims. Such evidence will plainly be helpful "to show what was then old, to distinguish what was new, and to aid the court in the construction of the patent."[24]

2.    **There is no support for the notion that extrinsic evidence must be limited to evidence that is dated *before* the filing date of the patents.**

SemPro's second objection to Johnson's extrinsic evidence is that some of the exhibits are "dated after the filing of the various patents-in-suit to which [the exhibits] relate."[25] Without citing any authority, SemPro asserts that such exhibits are irrelevant and "can never have any bearing" on claim construction.[26] But recent Federal Circuit caselaw makes this assertion insupportable.

In *Vitronics*—a case in which the sole issue was claim construction—the plaintiff brought suit in November 1991 for infringement of its '502 patent.[27] The district court considered a wide array of extrinsic evidence, including expert testimony, live testimony of one of the plaintiff's engineers, deposition testimony, technical articles, and a

---

[23]    *Id.*

[24]    *Markman,* 52 F.3d at 980 (quoting *Brown v. Piper,* 91 U.S. 37, 23 L. Ed. 200 (1875)).

[25]    Reynolds Letter at 1.

[26]    *Id.*

[27]    *See Vitronics,* 90 F.3d at 1579 (suit brought in 1991); *id.* at 1582 (claim construction is the only issue on appeal).

paper by one of the plaintiff's employees.[28] This employee paper had been written in 1994—which was plainly several years after the filing date of the patent.[29] And all the testimony considered by the court, including the deposition testimony, was clearly taken after that filing date.

The Federal Circuit ultimately concluded that because there was no ambiguity in the phrase "solder reflow temperature," as used in the claims, the district court should not have relied on extrinsic evidence "to vary or contradict the manifest meaning of the claims."[30] As explained in *Vitronics,* a district court should use extrinsic evidence in claims construction only if there is "some genuine ambiguity in the claims, after consideration of all available intrinsic evidence."[31]

But the Federal Circuit expressly approved of a trial court's hearing *all possible evidence* before construing the claim: "even if the judge permissibly decided to hear all the possible evidence before construing the claim, the expert testimony, which was inconsistent with the specification and file history, should have been accorded no weight."[32] As the court noted, if the district court had, instead, used "the expert testimony and other extrinsic evidence to help it understand the underlying technology, we could not say the district court was in error."[33]

---

[28]  *Id.* at 1581.

[29]  *Id.*

[30]  *Id.* at 1585.

[31]  *Id.* at 1584.

[32]  *Id.; see Tanabe Seiyaku Co.,* 109 F.3d 726, 732 (Fed. Cir. 1997) (extrinsic evidence may be considered "when appropriate as an inherent part of the process of claim construction and as an aid in arriving at the proper construction of the claim").

[33]  *Vitronics,* 90 F.3d at 1585.

Similarly, the *Markman* court concluded that a district court can properly admit extrinsic evidence and then later reject such evidence to the extent that it contradicts the construction required by the public record: "We conclude that (1) the trial court did not abuse its discretion when it admitted the extrinsic evidence offered by Markman—Markman's testimony and the testimony of Markman's 'patent expert'—on the issue of claim construction, and that (2) the trial court properly rejected this extrinsic evidence to the extent it contradicted the court's construction of the claims based on the specification and prosecution history."[34] As one Pennsylvania federal court recently recognized, a district court may properly "consider extrinsic evidence when helpful, such as expert testimony, learned treatises, and even sales literature."[35]

Moreover, the *Vitronics* court recognized that in some cases, district courts can go beyond merely considering such evidence. In construing ambiguous claims, they can properly rely on exactly the types of extrinsic evidence discussed in *Vitronics,* including the paper written by the patentee's employee several years after the patent issued:

> Here, the trial judge considered not only the specification, but also expert testimony and other extrinsic evidence, such as the paper written by the former Vitronics employee. No doubt there will be instances in which intrinsic evidence is insufficient to enable the court to determine the meaning of the asserted claims, and in those instances, *extrinsic evidence, such as that relied on by the district court, may also properly be relied on to understand the technology and to construe the claims.*[36]

---

[34] *Markman,* 52 F.3d at 981.

[35] *Applied Telematics, Inc. v. Sprint Communications Co.,* No. 94-CV-4603, 1996 WL 421920, at *5 (E.D. Pa. 1996) (citing *Markman,* 52 F.3d at 979, 980).

[36] *Vitronics,* 90 F.3d at 1584 (emphasis added) (citing *Markman,* 52 F.3d at 979).

This 1996 opinion from the Federal Circuit thus directly contradicts SemPro's argument that documents created after the patent's filing date "can never have any bearing on claim construction."[37]

By its very nature, most extrinsic evidence—including all expert testimony—will have been created *after* the date the patent was filed. Contrary to SemPro's view, that sequence of events provides no reason for excluding such evidence.

### Conclusion

*Vitronics* authorizes this Court to hear all possible evidence—including extrinsic evidence—before construing the claims at issue. This method promotes efficiency because it allows the Court to hear all the evidence that might possibly be useful and relevant, instead of: (1) hearing solely the intrinsic evidence; (2) deciding whether each claim is ambiguous; and (3) then possibly having to hear additional evidence to resolve any ambiguities in the claims.

Johnson therefore respectfully asks this Court to overrule SemPro's objections to Johnson's extrinsic evidence and to grant Johnson any further relief to which it is justly entitled.

---

[37] Reynolds Letter at 1.

JOHNSON'S BRIEF ON THE USE OF EXTRINSIC EVIDENCE—Page 9

Quo

Exp